OPINION OF THE COURT
Herman Cahn, J.
Petitioners bring this CPLR article 78 proceeding seeking a judgment reversing and annulling the decision of the Landmarks Preservation Commission (the LPC) to issue a certificate of appropriateness to Brewran West Associates (Brewran). The certificate of appropriateness was for the renovation of a warehouse located on the edge of the Tribeca North Historic District and the construction of a 19-story hotel tower at a site located partially adjacent to, but outside of, that historic district, and partially using the renovated warehouse. The project is known as the Hudson Hotel and Conference Center. Petitioners are residents of the Tribeca area who strongly oppose construction of the hotel because of perceived negative environmental and societal impact on their neighborhood. Intervenor-respondent Brewran is the owner of 256-258 West Street, which is currently a parking lot.
FACTS
The proposed work, as approved, consists of the complete restoration and renovation of a five-story warehouse known as *217 the Jovino building located at 416-424 Washington Street (at Vestry Street), within the Tribeca North Historic District. The Tribeca North Historic District was designated as a historic district pursuant to the Landmarks Preservation Law[1] by the LPC in December of 1992 and approved by the City Council in April 1993. The proposal also includes the construction of a 19-story tower at 256-258 West Street (between Laight and Vestry Streets), an adjacent site situated just outside the historic district. The tower is to be connected to the renovated warehouse via a two-story wing, and the warehouse, tower and wing would all be built on one merged zoning lot. The finished project would share mechanical, electrical, heating, ventilating and air-conditioning systems and would have one building permit and one certificate of occupancy.
The existing warehouse is not an individual landmark, but is considered a contributing building within the North Tribeca Historic District, which is characterized by its many low-rise warehouses. It was built in 1882 by Thomas R. Jackson, an architect who worked extensively in the Tribeca area. Currently, the record owner of the Jovino building is Amore Holdings Inc., and the beneficial owner is the Federal Deposit Insurance Corp. (FDIC). Since 1991, Amore Holdings Inc., with the approval of the FDIC, has had an agreement with Brewran to join the two sites.
Before Brewran’s involvement, the warehouse was vacant and badly deteriorated. Although the warehouse is presently still vacant and unusable, Brewran has undertaken interim measures, with the LPC’s approval, to temporarily stabilize it and prevent its further deterioration. The project calls for the total renovation of the warehouse, and the addition of a six-story penthouse. The finished six-story structure will contain the public areas of the hotel: a lobby entrance, restaurant, bar, health club, ballroom, a facility for community meetings, and some hotel rooms. The 19-story tower will contain the hotel’s main lobby and the majority of hotel rooms. The two-story connecting building will serve as a passageway between the six-story structure and the tower.
On September 27, 1993, Brewran filed an application with the LPC for a certificate of appropriateness for the project pursuant to section 25-305 (a) of the Landmarks Preservation Law. The project engendered massive community opposition. After *218 extensive public hearings throughout 1993 and 1994, the project was revised. On August 15, 1995, the LPC issued a certificate of appropriateness for the project, as finally revised and proposed.
DISCUSSION
In reviewing the actions of the LPC, the court is limited to determining whether the administrative agency had a rational basis for its determination or whether it acted in an arbitrary and capricious manner (Matter of Gilbert v Board of Estimate, 177 AD2d 252 [1st Dept 1991], lv denied 80 NY2d 751 [1992]; Matter of Committee to Save the Beacon Theater v City of New York, 146 AD2d 397, 405 [1st Dept 1989]; Matter of Society for Ethical Culture v Spatt, 68 AD2d 112, 116 [1st Dept 1979], affd 51 NY2d 449, 453 [1980]). The LPC is a body of historical and architectural experts to whom deference should be given by the court (Matter of Teachers Ins. & Annuity Assn. v City of New York, 82 NY2d 35, 41 [1993]; Matter of Gilbert v Board of Estimate, supra; Matter of Committee to Save the Beacon Theater v City of New York, supra; NY City Charter § 3020).
The Claim That the LPC Lacked Jurisdiction to Approve the Hotel Tower
Petitioners’ first cause of action alleges that the "approval” of the 19-story tower by the LPC was outside its jurisdictional authority, since its authority is specifically limited by the Landmarks Preservation Law to structures within a historic district (Administrative Code § 25-304 [b]). The second cause of action alleges that the LPC exceeded its authority by approving the height of the tower in violation of sections 25-307 (b) (3) and 25-304 (a) of the Landmarks Preservation Law which prohibits the regulation of a building’s height and bulk. Petitioners’ jurisdictional argument must be rejected on procedural and substantive grounds.
Procedurally, petitioners’ failure to object to the authority of the LPC visí-á-vis the hotel tower and actual encouragement of such action by the LPC invokes the separate principles of exhaustion of administrative remedies and judicial estoppel. As a general rule, courts will not review objections to an agency’s determination not raised at the administrative level (Matter of For-Med Med. Group v New York State Ins. Fund, 207 AD2d 300, 301 [1st Dept 1994], lv denied 85 NY2d 802 [1995]; Matter of Celestial Food Corp. v New York State Liq. *219 Auth., 99 AD2d 25, 27 [2d Dept 1984]). "The doctrine of exhaustion of administrative remedies requires 'litigants to address their complaints initially to administrative tribunals, rather than to the courts, and * * * to exhaust all possibilities of obtaining relief through administrative channels before appealing to the courts’ ” (Young Men’s Christian Assn. v Rochester Pure Waters Dist., 37 NY2d 371, 375 [1975] [citations omitted]). Although the exhaustion rule need not be followed when an agency’s action is challenged as either unconstitutional or wholly beyond its grant of power (Watergate II Apts. v Buffalo Sewer Auth., 46 NY2d 52, 57 [1978]; Matter of Celestial Food Corp. v New York State Liq. Auth., supra, at 27), "[application of these exceptions lies in the court’s discretion” (Matter of Community School Bd. Nine v Crew, 224 AD2d 8, 13 [1st Dept 1996]).
The doctrine of judicial estoppel prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken by him in a prior legal proceeding (Bates v Long Is. R. R. Co., 997 F2d 1028, 1037 [2d Cir], cert denied 510 US 992 [1993]). The elements of judicial estoppel are: "First, the party against whom the estoppel is asserted must have argued an inconsistent position in a prior proceeding; and second, the prior inconsistent position must have been adopted by the court in some manner” (supra, at 1038; see also, Kalikow 78/ 79 Co. v State of New York, 174 AD2d 7, 11 [1st Dept], appeal dismissed 79 NY2d 1040 [1992]; Chemical Bank v Aetna Ins. Co., 99 Misc 2d 803, 805 [Sup Ct, NY County 1979]).
The exhaustion rule should be applied in this case even though the petitioners are claiming that the LPC exceeded its grant of power by the Landmarks Preservation Law. This is not just a case where the petitioners failed to raise the jurisdictional issue before the administrative agency, but one in which they affirmatively sought the administrative action which is now claimed to be in excess of the agency’s jurisdiction. In fact, the petitioners’ jurisdictional claims are even contrary to certain allegations contained in their petition. As such they should be estopped from arguing that the LPC exceeded its jurisdiction vis-a-vis the hotel tower because the LPC adopted that position.
The record reveals that the jurisdictional issue was first raised in a letter dated October 26, 1993 from counsel for Brew-ran, and discussed at the first public hearing of the LPC held on that same date. During that first hearing and the numerous hearings which followed, several people who spoke on behalf of *220 the petitioners complained about the height of the proposed 31-story tower and insisted that the LPC must consider the architectural appropriateness of the tower as well as the warehouse. Brewran opted to work with the LPC, and, at considerable additional expense, responded to the LPC’s comments and suggestions regarding the architecture of the tower. As the result of LPC’s review and comments, Brewran reduced the tower component to 27 stories, to 25 stories and then to 21 stories. The LPC finally approved a 19-story tower, stating that this lower structure was more aesthetically respectful of the surrounding buildings. Thus, the LPC’s review of the Hudson Project resulted in the tower being reduced from 31 to 19 stories, an almost 40% reduction in height. The scaling back of the Hudson Project reduced the potential environmental impacts of which petitioners complain, such as traffic, views, light and sanitation.
Thus, only after petitioners’ strategy of getting the LPC to reject the project altogether have petitioners reversed their position and now claim that it was unlawful for the LPC to do exactly what they themselves previously urged the commission to do. Indeed, paragraph 3 of the petition alleges that "[t]he LPC acted arbitrarily in failing to consider the relationship and impact that a 19 story hotel located adjacent to the Historic District would have upon the Historic District.”
In any event, the LPC did not exceed its jurisdiction in issuing the certificate of appropriateness. Well aware that its jurisdiction was limited to structures situated within historic districts, the LPC nevertheless concluded as petitioners urged them to do that they needed to consider the entire three-part project’s relationship to the North Tribeca Historic District as well as the tower’s impact on the warehouse. The LPC properly exercised jurisdiction over the entire project because all three structural components of the project are totally integrated into a single hotel building with a single mechanical system. As the project was proposed and approved, no one component can stand on its own, and none can be built without the other. A wall of the historic warehouse will be pierced and partially removed to construct the two-story link and tower. Therefore, the LPC properly considered the aesthetic relationship between all of the linked structures.
Nor did the LPC violate sections 25-307 (b) (3) and 25-304 (a) of the Landmarks Preservation Law which prohibit the LPC from creating regulations or requirements regarding the height and bulk of buildings. The LPC did not specifically limit *221 the height of the tower to 19 stories; it merely approved the over-all aesthetic design of the proposed project including the tower’s mass in relationship to the warehouse and the project’s relationship to the North Tribeca Historic District.
The Claimed Need For an Environmental Impact Statement
The third cause of action alleges that no approval should have been granted by the LPC for the Hudson Project prior to the preparation of an environmental impact statement (EIS).
The City Environmental Quality Review Act (62 RCNY ch 5 [CEQR]) implements the requirements of the State Environmental Quality Review Act (ECL art 8 [SEQRA]) for the City of New York. Any action that is exempted or excluded from review under SEQRA is also exempted or excluded under CEQR (CEQR 5-02 [d]). SEQRA requires agencies to prepare an EIS "on any action they propose or approve which may have a significant effect on the environment” (ECL 8-0109 [2]).
Expressly exempted from the definition of "actions”, however, are "official acts of a ministerial nature, involving no exercise of discretion” (ECL 8-0105 [5] [ii]). Prior to January 1, 1996, the SEQRA regulations tracked the language of the statute in excluding from environmental review "official acts of a ministerial nature, involving no exercise of discretion” (6 NYCRR 617.2 [q] [former (2)]). In September of 1995, the SEQRA regulations were amended by the New York State Department of Environmental Conservation (DEC) to, inter alia, specifically exclude the issuance of historic preservation permits, like the certificate of appropriateness here, from SEQRA’s environmental review requirements. The regulations currently provide that:
"(c) The following actions are not subject to review under this Part * * *
"(19) official acts of a ministerial nature involving no exercise of discretion, including building permits and historic preservation permits where issuance is predicated solely on the applicant’s compliance or noncompliance with the relevant local building or preservation code(s)” (6 NYCRR 617.5 [c] [19]). These regulations went into effect on January 1, 1996 but are silent as to their retroactive effect.
In this court’s view, the amendment should apply to the LPC’s issuance of a certificate of appropriateness on August 15,1995 for the Hudson Project because it is a remedial regulation and remedial regulations are applied retroactively unless *222 that would impair the vested rights of the party seeking relief (Matter of Rudin Mgt. Co. v Commissioner of Dept. of Consumer Affairs of City of N. Y., 213 AD2d 185, 185-186 [1st Dept 1995]; Matter of Abbott, 136 AD2d 868, 869 [3d Dept 1988]). Here, 6 NYCRR 617.5 (c) (19) is undoubtedly a remedial regulation as it was promulgated as part of broader amendments intended to "streamline and simplify” the SEQRA process and "eliminate from review those actions that do not have a significant adverse impact on the environment” (see, DEC’s final generic environmental impact statement on proposed amendments to SEQRA regulations, dated Sept. 6, 1995, at 1, Appendix A to Brewran mem of law). In amending this exemption, DEC added the "including” language to clarify that building permits and historic preservation permits should be considered official acts of a ministerial nature involving no exercise of discretion. DEC’s revision did not change or create substantive rights, but rather clarified "imperfections in prior law” that had led to needless challenges to the issuance of ministerial permits (Matter of Asman v Ambach, 64 NY2d 989, 991 [1985] [statutes intended to " ' " 'correct imperfections in prior law’ ” ’ ” are remedial], quoting Matter of Cady v County of Broome, 87 AD2d 964, 965 [3d Dept 1982]).
Petitioners make no argument that this is a situation where retroactive application would impair any vested right of the party seeking relief nor could they since the only rights that vested upon issuance of the certificate of appropriateness belong to the developer, Brewran. Petitioners merely contend that the amendment should not be applied retroactively because it is "an attempt to alter longstanding City policy and create an exception that did not exist prior to the [regulations’] passage” (petitioners’ mem of law, at 16). However, petitioners offer no legal or factual support for this statement. To the contrary, it appears that the LPC has always considered its determination of requests for certificates of appropriateness pursuant to section 25-307 of the Landmarks Preservation Law as "ministerial” within the meaning of 6 NYCRR 617.5 (c) (19), and thus excluded from the statutory definition of "action” (see, Matter of Committee to Save the Beacon Theater v City of New York, 146 AD2d 397, supra [petitioner raised LPC’s failure to review an EIS prior to taking action on landmark’s application and First Department, albeit in dicta, found that the LPC had not acted arbitrarily or capriciously]).
The Court of Appeals analysis in Incorporated Vil. of Atl. Beach v Gavalas (81 NY2d 322 [1993]) confirms that no EIS *223 was required. In that case, the Court held that the issuance by a municipal agency of a building permit is not an "action” under SEQRA requiring the preparation of an EIS as a prerequisite to approval of the permit. Focusing on the purpose of an EIS, the Court of Appeals explained that the determination as to whether an action was "ministerial” or "discretionary” for SEQRA purposes turned on whether the information contained in an EIS may form the basis for a decision whether or not to undertake or approve the action (at 326, citing Matter of Film-ways Communications v Douglas, 106 AD2d 185, 187 [4th Dept 1985], affd 65 NY2d 878 [1985]). When an agency’s "discretion is circumscribed by a narrow set of criteria which do not bear any relationship to the environmental concerns that may be raised in an EIS, its decisions will not be considered 'actions’ for purposes of SEQRA’s EIS requirements” (Incorporated Vil. of Atl. Beach v Gavalas, at 326).
A decision by the LPC to issue a certificate of appropriateness is likewise "ministerial” within the meaning of SEQRA. The LPC bases its decision upon the definite standards imposed by the Landmarks Preservation Law. When determining whether to issue a certificate of appropriateness, the LPC is only considering whether the proposed work effectuates the purposes of the Landmarks Preservation Law (Administrative Code § 25-307 [a]), those purposes being the protection, enhancement, perpetuation, and use of buildings, structures and landscape features within the City of New York having a special character or special historical or aesthetic interest or value (General Municipal Law § 96-a; Administrative Code § 25-301; Shubert Org. v Landmarks Preservation Commn., 166 AD2d 115, 117-118 [1st Dept 1991]). In making this determination, the LPC considers whether the proposed work effects "the exterior architectural features” of the building, and whether the proposed work effects other neighboring improvements in the historical district (Administrative Code § 25-307 [b]). It considers such factors as "aesthetic, historical and architectural values and significance, architectural style, design, arrangement, texture, material and color” (Administrative Code § 25-307 [b] [2]). The LPC was created with a very specific and limited mission — to designate and protect landmarks and historic districts. The LPC is not authorized to regulate matters ordinarily considered in the zoning process such as "the height and bulk of buildings, the area of yards, courts or other open spaces, density of population, the location of trades and industries, or location of buildings designed for specific uses” *224 or the "creat[ion] [of] districts for any such purpose” (Administrative Code § 25-307 [b] [3]; § 25-304 [a]).
Contrary to petitioner’s characterizations, the LPC did not "approve” the Hudson Project. It merely determined that the proposed exterior features of the warehouse and the tower were architecturally appropriate for, and in harmony with, the exterior architectural features of the buildings in the North Tribeca District. It did not, and has no jurisdiction or authority to, review, approve or disapprove the project’s environmental impacts (see, Shubert Org. v Landmarks Preservation Commn., 166 AD2d, at 121, supra [LPC must not "misconstrue zoning matters for landmark matters”]). Indeed, as the LPC specifically noted in the August 15, 1995 certificate of appropriateness "the proposed tower is not in conformance with the current zoning, and * * * therefore its construction would require a number of variances to be granted by the Board of Standards and Appeals [BSA].”[2]The chairperson of the LPC made this point very clear at the December 21, 1993 public hearing:
"the chair: [Brewran is] not asking for a special variance here, just to clarify. They go to the Board of Standards and Appeals and ask for a variance. Here they are asking for a Certificate of Appropriateness. We have no special permits here. "mr. peyre:[3] Okay.
"the chair: We’ll be glad to explain to you our different review processes and permits, but they are not asking for one here. They are not going for a special permit from the Landmarks Commission” (R. 468).
Before making its determination, the BSA will require an extensive environmental review and this review has already begun. The review will address all of the alleged environmental impacts that the petitioners say will adversely affect their neighborhood. Petitioners will have an opportunity to participate in the review process.
Petitioners’ Remaining Claims
The fifth cause of action alleges that the approval of the project by the LPC was arbitrary and capricious and an abuse of discretion because it was done without (1) examining the *225 terms of the November 25, 1991 joint venture agreement between Brewran and Amore Holdings Inc. (title owner of the warehouse) and the FDIC (beneficial owner of the warehouse); and (2) examining the DOB objection sheet allegedly in violation of its own rules. However, petitioners have wholly failed to demonstrate that terms of the joint venture agreement or the DOB objection sheet have any impact on a historical landmark determination, nor have they identified which LPC rules were violated.
CONCLUSION, ORDER AND JUDGMENT
The court concludes that the determination of the LPC that the Hudson Project, as finally proposed, meets the criteria of the Landmarks Preservation Law and the LPC’s decision to issue a certificate of appropriateness on August 15,1995 to Brew-ran was rationally based and not arbitrary or capricious. Accordingly, it is hereby ordered and adjudged that the petition is denied and the proceeding is dismissed.

. Administrative Code of City of NY, tit 25, ch 3, § 25-301 et seq., entitled "Landmarks Preservation And Historic Districts”.

. The Landmarks Preservation Law specifically provides that the LPC must issue a certificate of appropriateness before the BSA can consider or issue a variance application (Administrative Code § 25-305 [b]).

. Mr. Peyre was the community representative for Congressman Jerrold Nadler who represents the 8th Congressional District in which the proposed project lies.